and tell us who you represent, your name and who you represent. And I noticed that neither party asked for oral argument in this case, but the Court has discretion to determine whether we want to grant oral argument, and we have certainly done that in this case. And we will ask you questions accordingly as the case, as the argument proceeds. Each side normally has 15 minutes. We don't watch the clock strictly. But I would ask you to get to your strongest argument first. Remember that we have read the briefs. We have read the record. We're very familiar with your case. So it's important that you get to your strongest argument first. After lunch, save a few minutes for rebuttal. Please approach. Actually, Ms. Clark, please call the case. We've got to keep things according to protocol. 11-1506 Jones and he, he, he, and her, Mr. Michael v. Laurato at all. I should also tell you Justice Connors, who is not present today, will be participating in the resolution of this case. She has read the briefs and the record, and she will listen to the tapes of the oral argument. So make sure that the microphone is turned towards your counsel. Can you pull that microphone around? Because that's all being recorded. Okay. First thing, please. Your Honor, my name is Allison Sullivan. I represent Joan Hinken, the plaintiff in Appalachia. Thank you. Good morning, Your Honor. My name is Ian Hoffenberg, and I represent the defendant, Appalachia, Michael v. Laurato. Thank you. Okay, counsel, whenever you're ready. He's the appellant. I'm sorry. I'm sorry, the appellant. Sorry. Okay. Well, normally, you want to switch sides? Yeah, you have it. Okay. Normally, the appellant is over there and the appellee is over there, and we like to keep things very close. My apologies. So, counsel, just have a seat. You're the appellant? Appellant, yes. Please have a seat, counsel. May I begin? Yes, please. Ian Hoffenberg for defendant Appalachia, Michael v. Laurato. This is here on Mr. Laurato's appeal from the circuit court trial verdict for the plaintiff on count two of plaintiff's complaint in which the plaintiff alleged unjust enrichment. In her complaint, the plaintiff, a veterinarian, sought to recover payment for alleged services to horses allegedly owned by the defendant, Michael Laurato, well, referred to as Mr. Laurato. The trial court held for Mr. Laurato on count one, in which the plaintiff alleged breach of oral contract, and the trial court held for plaintiff on count two of the complaint which alleged unjust enrichment or quantum merit. Mr. Laurato, on appeal here today, argues several bases for that the verdict on count two should be overturned. The first argument that Mr. Laurato makes is that the plaintiff's actions violated the Illinois administrative code. Counsel, what's the standard of review? The standard of review, we believe on this issue, we would argue that it's de novo. Really? And why is that? Because the argument that we're making here today is on public policy grounds. We believe that given the facts that came out at trial, that public policy would prevent enforcement. What specifically are you referring to? We're referring to that the plaintiff's actions were in violation of public policy as set forth by the Illinois administrative code, which is the governing rules for horse racing. Specifically what, Mr. Huffenberg? The section of the code is? No, what specific actions of the plaintiff are you talking about? So the actions, there's two sets of actions that we bring forth in our appeal. In response to my question, you believe the standard of review is de novo, and you believe it's de novo because you're making a policy argument, and the policy argument is based on what you allege are violations of the administrative code. That's the threat, right? Correct. And what specifically are those violations? The plaintiff administered an anabolic steroid to Mr. Lorado's horses in violation of section 603.210, subsection A, subsection 2, and subsection B of that section of the code, which prohibits the administration of that anabolic steroid to these specific types of horses. The plaintiff also administered? Is that what the code says? I thought that section of the code restricted the or governed the amount of the anabolic steroid that could be given to geldings. I didn't think it said that it couldn't later. There was an amendment to the code later, but maybe I'm mistaken. But go on. Well, the code, what it does is, our position is that it allows administration of this steroid to certain specific horses, but not geldings. It does not allow administration to geldings. Right. And my client clearly testified at trial that all of his horses were, all of his males. Are we talking about Lasix or Equipose? Equipose. Okay. Excuse me, Your Honor, yes. But isn't there a section of the code that you're talking about, doesn't that section limit, doesn't that section regulate at least the time period that it was in effect? That's in question here. That section of the code regulated the amount of the drug that could be given to geldings. It didn't say that that drug couldn't be given to geldings. That was my reading of the code. Let me just pull up. We, respectfully, Your Honor, we. Could you respond to that, please? Because I, if I am mistaken, I want to be corrected so that I'm not off on a tangent. My client's interpretation of the code is that Equipose. Why don't you read the specific section of the code to me that you're talking about? Sure. 603.210. The use of the, any one of the following four anabolic steroids is permitted if the following urine or plasma threshold concentrations are not exceeded. And then it's bold and known, Equipose, in male horses other than geldings. And then it has some technical language there. What does the, what does the language if the following such and such are not exceeded? That's a limiting, that regulates something else. It doesn't say that it can't ever be given to geldings. That's not how I interpret that section at all. Well, then subsection B that I would point the Court out to, that no other anabolic steroids shall be administered, I think that that, I think, kind of closes the loophole. So we do believe that Equipose should not be given to geldings. That's where you're. It's not important to me what you believe, Mr. Hoffenberg. What I would like to know is the specific language of the statute, the administrative code that you are relying on for your argument that this is, that the standard of review is de novo, and I'm not following your argument. I think the language other than geldings is what we're focused on here. It's the use of the following steroids is permitted in male horses other than geldings. But read the rest of it. It also talks about 15 milligrams per milliliter in urine. I mean, doesn't that refer to the amount of the drug that should be administered? Well, I. It doesn't say, as you're claiming, that it's only permitted to be administered to horses other than gelding. Rather, it addresses the amount of Equipose that's allowed in male horses other than geldings. That's what that. I mean, we are required to give the administrative code or any other code its plain meaning, and that's what the language of the administrative code says. Well, I believe it's a qualification that. It doesn't even address Equipose and geldings, as you allege. I mean, maybe a later version of the code does, but not what you're reading to me, in male horses other than geldings. So I am baffled as to how you believe that the standard of review is de novo. Well, I would read this as the second portion of that sentence is a qualifier for the first portion of the sentence grammatically. And there is a semicolon here. And so, in other words, the code is saying that in horses other than geldings, these amounts are allowed. Then subsection B goes to no other steroids shall be administered. So the code is reading that if you're going to give Equipose, it has to be given to horses other than geldings. And when you give it to those other horses, these amounts are restricting the amount that can be given. The code is very, very heavily restrictive of amounts that these drugs can be given, extensive throughout. Counsel, excuse me for interrupting. Notwithstanding what the code says, and I believe that Justice Cunningham is absolutely correct in her statements, but notwithstanding whether or not the administrative code prohibited this, didn't the court find as a matter of fact that had it been given, then the horses would have been tested positive at the time of the race and would have been disqualified. Taking that, she reached a question of fact, decided a question of fact, as to whether or not the veterinarian should be compensated. And believing that the horses would have been disqualified had it been injected. I think that's a strawman issue here. Didn't the court, in fact, make a finding of fact that what was more material or was that the horses would have been disqualified at the time of the race, and that did not happen? So we have a court making a finding of fact, and I believe the standard of review would be an abuse of discretion here. So that ruling surrounded the LASIKs. That ruling by the trial court surrounded the administration of LASIKs. The plaintiff testified that she believed, and this was hypothetical testimony in my opinion, so the plaintiff testified that if LASIKs was administered on race day and if the horse was not on the bleeder's list, then that horse would have been disqualified. So that is the testimony of the plaintiff at trial. The basis of the ruling for equipoise is that the code wasn't being enforced. And so that, in my opinion, is a public policy problem with that ruling. A court should not be ruling that it's okay that a plaintiff violated the code. And, by the way, the court admitted that the plaintiff did that in her ruling, but said it just wasn't being enforced. And that's my problem with that ruling. The LASIKs is ‑‑ I believe that the judge said that there was testimony that during the time, I think the testimony from the veterinarian is that she believed the code went into effect on January 1st of 09. The defendant's lawyer showed that the code may have gone into effect on May 1st of 08. And the court said that there is testimony as to whether or not the code was actually being enforced. And you're correct at that time because the date that it's actually in effect and when the racetrack personnel and others really begin to understand that the code is in effect, the judge seemed to have taken some judicial notice of that. But I think that that begs the question as to what the standard of review is. And so, you know, let's just move on, though, because I will tell you I do not believe that the standard of review is de novo.  And you have to establish something that's consistent with just reams of Illinois case law for us to apply the de novo standard. And you're not doing it so far. And, you know, we can't just adopt the de novo standard because you'd like us to or because we'd like to. We need to have the course of the law behind us. And the arguments aren't giving me that to tell you the truth. So why don't we move forward? What is the gross error here? What was the error of the trial court that brings you to the appellate court on a $3,000 case? That the ruling essentially ignores the code and that it allows conduct that is in violation of the code but says that it's okay because it just wasn't being, the plaintiff believes that it wasn't being enforced. That's the problem that I have with that part of that ruling. The judge knew the code was in effect. And even at one point she says, I take pause at this. Acknowledged that there was a violation and said that she agreed with the plaintiff's testimony that I as plaintiff just didn't believe the code was being enforced. That's a very bad slip of the slip, I think, to allow a court to engage upon because it allows a party to say, I wasn't aware of that public policy or I wasn't, I didn't think it was being enforced. And therefore, when I violated that public policy, it was okay. That's the problem I have with that part of the ruling and that's why I think that as a matter of policy, that ruling was an error. The second argument by Mr. Lorado involves the drug Lasix. And here to Lorado, our misplaintiff's conduct violated the code administration of Lasix  The testimony by my client was that his sources were not on what's called a bleeder's list. The plaintiff's response is that she was allowed to give Lasix, and I'm paraphrasing, she was allowed to give Lasix, just not on race day. We believe this is not a valid interpretation of the code. And the plaintiff, excuse me, I'll strike that. The code states Lasix shall be administered to a horse that has entered a race only after placed on the bleeder's list. And that's section 603.70, subsection C. The code does not state that a horse can be given Lasix, just not on race day. The record doesn't support this argument either. The testimony of the plaintiff is that she calls this a race day medication. Lasix is only given on race day, and therefore we, excuse me, the code details this in, for instance, in 603.70, subsection I, discusses several uses of the drug Lasix on race day. This drug is given to horses when they bleed, when they race, they bleed through their lungs, and this drug is given to the horse to prevent that from happening when they race. So the only application of that drug is on race day. So furthermore, I would say that the response of the plaintiff here is that it should be viewed, I think, with a skeptical eye because there's also separate sections of the code that put forth the responsibility to get forth confirmed bleeders on a bleeder's list. And therefore, if the plaintiff was administering Lasix but not on race day, that would bring forth, that would arise a separate section of the code, we think, that would also cause her actions into question, and that's subsection 603.70, subsection D, subsection II. Assuming for the moment that technically the services were against the code, why would that preclude the plaintiff from proceeding with a claim for unjust enrichment? She performed the services, did the act, administered the medication, and unjust enrichment is more or less an equitable legal counsel. So why would that defeat unjust enrichment? Your client said he never even had much of a relationship. He just saw her on one day and had some conversation. Well, I think that my response to that would be is that the code is very detailed and promulgates a public policy. Looking through the code, it seems to promulgate two public policies, and it seems to be the health of the horse is one public policy, and then the second public policy seems to be to protect the integrity of the horse racing industry. It seems to me that I will admit that a violation of the statute is not per se a basis for a bar for a plenary claim, but it seems to me that there is here a violation of a public policy that is, I think, weighty enough that it should bar the enforcement. We have actions that I think are analogous to, in the cases that I've cited in Lior's v. Dix, actions that are unethical, and we feel, and I think violation of a strong public policy so that therefore should not be allowed to be enforced. That's our position on that. Let me ask you something. I couldn't discern this from the argument of the record. There's a lot of talk about the administration of Lasix and the administration of Equipose, but it doesn't tell me whether that's the only thing that this veterinarian, that's the only service that this veterinarian performed for the horses. I gathered from everything I read that she did some other things, too, but the administration of those two drugs is what the defendants focused on. What about the unjust enrichment as to the other veterinary services that she provided? Well, I can hear my client's voice in my head. I know how he would respond, and he would respond that, you know, as far as the other services, his argument would be that he never authorized them and he feels no benefit was conferred. The other arguments that we put forward would apply to those other services as well. As far as the public policy argument in terms of Equipose and Lasix, those are the two, you're correct, things that she did for these horses over a period of about two years. So my client's argument on that is that... No, I want your, you're here on behalf of your client, so I'd like to know what you think. Well, the other treatments were never authorized by my client. He did not want those treatments. He had, the nature of this relationship is that a horse owner hired a trainer, and then the code puts specific responsibility upon the trainer to... Are you really seriously saying that the trainer, when the owner contracts with the trainer, the trainer doesn't get to determine what services the horse needs and he has to call the trainer, the owner in Florida or wherever he lives every time he thinks the horse needs veterinary services? Is that, I mean, that's what you're saying. That doesn't make any sense to me. That's not a believable argument. Well, I don't know if the trainer should call the owner on every occasion, but my client... But you said he didn't authorize the services, and there was testimony from this vet that during the course of her interaction with Mr. Tamillo, whatever his name was, she treats the horses based on his direction and whatever he asks her to do. And tacitly or implicitly, your client had agreed to that because he did pay some of her bills. So to now later say, well, I didn't authorize that, that just seems disingenuous at best. Let me just put it that way. Well, I will point out that my client's specific testimony regarding his relationship with the trainer, he instructed the trainer that he did not want these treatments. And so I think it would be unfair to require him to pay for treatments that he specifically instructed the trainer he didn't want, he feels he didn't need. But he paid for them over a period of two years. And when he stopped paying, that's when the trouble started. But he didn't want them, but he paid for them over a period of two years. Well, I believe the testimony was is that he paid for them when he was, when he needed a certificate from the veterinarian to move his horses. So I would, in the context of that, I think the mere payment of the bill doesn't. Now, he also testified that Mr. Tamillo paid for the services out of the money that he paid to Tamillo. And when he paid the last amount to Tamillo, Tamillo didn't pay the vet. And the vet, therefore, went after the trainer. And then the trainer said, but I've already paid Tamillo, and he should pay you. And so the he said, she said began, and that's how this all ended up here. But to say that he didn't want the services and never knew they were being rented and didn't contract for them, that kind of flies in the face of the testimony. Anyway, you can proceed. I believe. And bring your remarks to a close. Okay. Just a couple things. Sorry? You pretty much used up your time, so why don't you bring your remarks to a close. Okay. I believe the testimony, just real quick, I believe the testimony was is that he paid the trainer, and however the trainer chose to pay the veterinarian was the trainer's decision. So just wanted to respond by that. One other point I wanted to respond, you know, the effective date of the code that the, that at trial that code was presented to the court. It's, I now believe the effective date of that code goes back to 1997. It's very difficult to determine the effective date of this code because the code is constantly being amended and updated. That date on the effective date of the exhibit that was presented to the judge I believe was an amendment date. So I think even there's, I would argue that the code is effective, at least the section 600, going back to 1997, though it is very difficult to ascertain, the Illinois Register is about 20,000 pages per year, and it only goes back to 2002. The code is constantly being updated. So I just wanted to bring that to your attention. Lastly, I talked about the, my client believes that no benefit was conferred, and that the case that we cite to is First National Bank versus Malpractice Research, 179 L. Second, 353. As an analogy, he believes, my client, Mr. O'Leary did not want the treatment. He didn't authorize it. He testified that the horses were healthy and that they were against his wishes. And lastly, the argument that we make is a foundational one based upon the statement that was submitted. The testimony of plaintiff regarding this law, there was two exhibits that the plaintiff submitted. One was invoices and the other was a statement. It was a long summary of her services, which we believe the court based its ruling upon. The plaintiff testified it's not a common thing that she does, that she didn't keep that record, that there was a bookkeeper that kept it, the bookkeeper wasn't there. We believe it was error to allow that to come into evidence. It was entered into evidence over the objection, over my objection based on foundation and hearsay. So with that, I would. No, I do not.  Thank you, Judge. Thank you, Your Honor. Counsel, in the future, when you come to the appellate court, Apollon sits on that side and Apollon sits on this side, okay? Good morning. Good morning. Allison Sullivan. Your Honors, my general argument is I laid out in the brief, which I know you're familiar with, the defendant essentially set forth for the first time at trial these. Excuse me. You're Allison? I'm sorry. Allison Sullivan. Sullivan? Yes. Very good. Proceed. The defendant essentially for the first time at trial set forth these affirmative defenses that these drugs, Lasix and equipoise, were given in violation of the administrative regulations. I feel that he failed to prove these defenses at trial, and he failed to prove that they were administered in violation of the law. He did not prove that the presence of the drugs was found in any pre- or post-race bodily fluid samples, which is the method used to determine whether they're present in the horses or not. But if your client has them listed on her bills, we assume that they were given. So the fact that they were not present in bodily fluids is an interesting thing, but I don't know that that goes to whether or not they were actually given. Well, I think the argument I'm trying to distinguish is whether or not the drugs were given on race day. I mean, these drugs tend to be beneficial to the horses, you know, at other times, but I think they're monitored pursuant to the administrative regulations on the actual race day. As far as the Lasix goes, the defendant also did not provide any evidence of this bleeder's list. It was his testimony against the plaintiff, the veterinarian, who is a state-licensed veterinarian who's been practicing for nearly 30 years. The judge simply found his testimony to lack credibility. And as far as the equipoise, my client testified that, and again she's been practicing at racetracks for nearly three decades, that this regulation regarding the equipoise was not in practical effect and wasn't being enforced at the time that she provided these services to the horses. She provided her services to the defendant's horses for over a year, and the equipoise and Lasix did just constitute a small fraction of all of the services that she provided for these horses and the statements and invoices to reflect all of these services and medications that she administered to these horses for over a year. Your client's horses, they were not geldings? Well, his clients would have had them. Oh, excuse me, his clients. His client was the owner of the horses.  He testified that they were geldings. They were geldings. He testified that they were geldings, yes. Does the code address the use of equipoise in geldings? I believe, as Judge Cunningham stated earlier, it addresses the use of equipoise insofar as it discusses the level of the drug that can be administered to the geldings. So in that regard, it does discuss equipoise. The party's testimony basically was just directly conflicting during the trial, and again, the judge as the trier of fact was the person responsible for determining  What do you take the standard of review as? Your Honor, I argued in my brief that the standard of review was whether or not the judgment was against the manifest weight of the evidence. I'm wondering now, and as I was preparing, I kind of questioned myself on that, and I think that it probably should have been abusive discretion. Either way, I completely disagree with the defendant that it's de novo. I believe that there were factual disputes at issue throughout the trial based on the conflicting testimony of the parties, and that the judge's determination of their credibility should be given deference. Anything else, counsel? I believe that Don't feel obligated to stand up here just because the time hasn't run out. I believe that covers the extent of the arguments I've made. As I said, we have read the material very carefully. We're familiar with the facts of the law on this, and to the extent that we have questions, we ask them. But you don't have to feel obligated to use up all your time just because it's a lot. Well, in that case, I do believe that I've basically covered my points. I don't want to ramble on and waste anyone's time here. We appreciate the lack of rambling. Certainly answer any questions you have. If not, I appreciate you taking the time to review the facts carefully and listen to my argument this morning. Any questions? No, thank you. Mr. Hofinger, a brief rebuttal, please. If you have one. You don't have to feel compelled to rebut either if you don't have a rebuttal. I believe that Well, in that case, this case will be taken under advisement, and the court stands adjourned. Thank you very much for your argument. Thank you.